1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11   KERI MCELMURRY AND KAREN        )
     MRAZEK INDIVIDUALLY, and on     )
12   Behalf of All Similarly        )
     Situated                        )     No.  CV-04-642-HU
13                                    )
                    Plaintiffs,       )
14                                    )
         v.                           )
15                                    )     FINDINGS & RECOMMENDATION/
     US BANK NATIONAL ASSOCIATION,    )     ORDER
16                                    )
                    Defendants.       )
17   _____)

18   J. Dana Pinney
     A.E. Bud Bailey
19   David Schuck
     Jose Mata
20   Jon M. Egan
     BAILEY, PINNEY & ASSOCIATES, LLC
21   916 Broadway, Suite 400
     Vancouver, Washington 98660
22
            Attorneys for Plaintiffs
23
     Carol J. Bernick
24   Christopher F. McCracken
     Kevin H. Kono
25   DAVIS WRIGHT TREMAINE, LLP
     1300 S.W. Fifth Avenue, Suite 2300
26   Portland, Oregon 97201

27          Attorneys for Defendants

28   / / /

     1 - FINDINGS & RECOMMENDATION/ORDER

1   HUBEL, Magistrate Judge:

2       Plaintiffs Keri McElmurry and Karen Mrazek bring this Fair
3   Labor Standards Act (FLSA) action on behalf of all similarly
4   situated plaintiffs and against US Bank National Association.
5   Plaintiffs seek to bring this case as a collective action under 29
6   U.S.C. § 216(b).

7       In their Second Amended Complaint, plaintiffs bring four
8   claims for relief:  (1) a claim by sales and service managers
9   (SSMs) who allege that they were misclassified as exempt employees
10  and thus denied overtime pay in violation of the FLSA, 29 U.S.C. §
11  207; (2) a claim that defendant's use of a certain conversion chart
12  on weekly time reports caused hourly employees to consistently
13  under-report the actual time worked, causing any employee working
14  approximately 40 or more hours per week to have been denied
15  overtime in violation of the FLSA, 29 U.S.C. § 207; (3) a claim
16  that defendant's use of the conversion chart at issue in claim two,
17  caused hourly employees to consistently under-report the actual
18  time worked resulting in the nonpayment of wages in violation of
19  the FLA.'s minimum wage protections, 29 U.S.C. § 206; and (4) a
20  supplemental state claim under Oregon Revised Statute § (O.R.S.)
21  652.410 contending that wages were not timely paid upon termination
22  of employment.  Plaintiffs allege that the three FLA. claims are
23  willful violations.

24      Presently, plaintiffs move for an order allowing notice to be
25  sent to putative collective action members in Washington,
26  California, and Oregon, as to the conversation chart overtime and
27  minimum wage claims. Plaintiffs also move for an order tolling the
28  statute of limitations for all putative collective action members

2 - FINDINGS & RECOMMENDATION/ORDER

1    as of the date of the filing of this action through the pendency of
2    the notice process.    Defendant moves to strike certain materials
3    and supplemental materials plaintiffs rely on in support of their
4    notice motion.

5        I recommend that plaintiff's notice motion be denied.    I
6    further recommend that plaintiff's tolling motion be denied as
7    moot.    I deny the motions to strike as moot except for the motion
8    directed at certain parts of Pinney's declaration which I grant.

9                              PROCEDURAL HISTORY
10       The original Complaint in this case was filed on May 11, 2004.
11   Before filing the case here, the case was filed in Multnomah County
12   Circuit Court in July 2003, with the SSM exemption overtime and
13   late pay/termination claims.    While defendant's motion to dismiss
14   was pending in that court, plaintiffs voluntarily dismissed the
15   case in March 2004 and then refiled it here, adding the conversion
16   chart claims.

17       Additionally, there are two pending state court cases with
18   different plaintiffs, although they all share the same counsel,
19   which raise similar claims.    In Rivera v. U.S. Bank National
20   Association,  Mult.  Co.  Case  No.  0305-05045,  the  plaintiffs
21   challenge the conversion chart, both as to its effects on overtime
22   and minimum wage, under Oregon law.    They also bring a late
23   pay/termination claim.    In Belknap v. U.S. Bank National
24   Association, Mult. Co. Case No. 0301-00042, the plaintiffs assert
25   a late pay/termination claim.

26       Shortly after filing this case in this Court, plaintiffs moved
27   for an order for notice to be sent to the putative collective
28   action members for both the conversion chart and SSM claims.

3 - FINDINGS & RECOMMENDATION/ORDER

1    During the briefing process, plaintiffs limited the motion to only
2    the conversion chart claims.  At that time, the parties and the
3    Court referred to the conversion chart claims as the "rounding"
4    claims.

5        In a July 27, 2004 Findings & Recommendation, I recommended
6    that the notice motion be denied and that the accompanying tolling
7    motion also be denied.  Judge Haggerty adopted the Findings &
8    Recommendation on October 1, 2004.  Because of the parties'
9    familiarity with these previously issued opinions, I do not
10   summarize them here.

11       Plaintiff filed a Second Amended Complaint on June 2, 2005.
12   The claims are essentially the same as in the original Complaint
13   with a slight change in emphasis in the conversion chart claims
14   from an attack on a particular weekly time report to an attack on
15   the specific conversion chart itself, and a change in nomenclature
16   from one of "rounding," to what plaintiffs now call "truncation."
17   The significance of the changes, if any, is discussed below.

18                            DISCUSSION

19       In their first notice motion, plaintiffs relied on data from
20   weekly time reports obtained in the discovery process in the Rivera
21   case.  In this renewed motion, plaintiffs rely on this same
22   evidence:  weekly time reports for a six-month period for 131 US
23   Bank employees at 10 out of 181 US Bank branch locations in Oregon.
24   Although this evidence remains unchanged, plaintiffs have now hired
25   two experts, one to build a database into which they entered the
26   information from only some of the weekly time reports, and the
27   other, a statistician, to opine on the meaning of some of the data
28   and to draw extrapolations from the data.

4 - FINDINGS & RECOMMENDATION/ORDER

I.  The Database and the Statistical Analysis

    A.  Preparation of the Data

    Plaintiffs' counsel had the data from the weekly time reports entered "into digital form into spreadsheets and formatted into a spreadsheet framework."  PINNEY Declr. at ¶ 5.  Plaintiffs then selected 79 out of the 131 employees, based on a manual inspection of the time cards.  According to plaintiffs, these 79 had substantial underpayments due to the challenged conversion chart. Id.  As for the rest of the 131, plaintiffs' counsel Dana PINNEY "believes" that "they also would likely have underpayments due to the U.S. Bank conversion chart."  Id.

    Plaintiffs' counsel transferred the weekly time report data for the 79 employees into a database.  Id.  Plaintiffs then retained George Shubin, a software consultant and programmer with substantial database experience, to develop an "Access database" that would hold data extracted from the weekly time reports, and allow for certain calculations to be done and reports to be generated from the data.  Id.  As described in more detail by Shubin, a program was written for use with the database to calculate the number and amounts of underpayments for each of the seventy-nine employees due to the challenged conversion chart.  Id. Plaintiffs contend that by using the calculations made by the database program, it is possible to generate database reports regarding the underpayments relating to each of the respective 79 employees.  Id. All of the raw data that went into the database is attached to Pinney's declaration.

    B.  Shubin's Database

    After the weekly time report data was put into an Excel

5 - FINDINGS & RECOMMENDATION/ORDER

1   spreadsheet, Shubin designed the structure of a "database
2   container" using Microsoft Access.  Shubin Declr. at ¶ 2.  He then
3   imported the Excel data into Access.  Next, he developed a data
4   maintenance and verification program in Microsoft Visual Basic that
5   allows a user to view the weekly time report data, compare it with
6   an image of the original handwritten weekly time report, and make
7   any necessary corrections to fix any mistakes that may have
8   occurred in the conversion of the weekly time reports from paper
9   into Excel.  Id. at ¶ 3.

10   Shubin then created "logic," also in Visual Basic, that would
11   calculate the "difference between the rounded-down work hours on
12   the timesheets and non-rounded hours."  Id. at ¶ 4.  "Logic" was
13   also created to "discern when loss of hours was the result of
14   rounding that had taken place rather than from human mathematical
15   error."  Id.  Shubin then prepared reports to display in detail and
16   summary form the amounts of unpaid hours that resulted from the
17   rounding-down on the weekly time reports.  Id.

18   In explaining the "calculation logic," Shubin first notes that
19   the data entered into the database included (1) the time in hours
20   and minutes the employee began work, (2) the time in hours and
21   minutes the employee ended work, (3) the beginning and end times in
22   hours and minutes for lunch breaks, (4) the beginning and end hours
23   and minutes for other breaks and/or time off, and (5) the daily
24   total hours and minutes expressed in hours and tenths of hours.
25   Id. at ¶ 6.

26   Shubin explains that time lost due to the challenged
27   conversion chart for any given work day is computed by first
28   computing the actual total number of minutes worked on that day

6 - FINDINGS & RECOMMENDATION/ORDER

1    according to the time report, deducting time taken for lunch or
2    other unpaid time.  Id. at ¶ 7.  This total actual number of
3    minutes worked is then compared to the hours and tenths of an hour
4    recorded by the employee for that day.  Id.  Any difference between
5    the amount of time actually worked and the amount of time recorded
6    for payment is noted.  Id.  The difference is then "looked up" in
7    a table to determine the number of minutes the particular employee
8    "lost" on that day due to the use of the challenged conversion
9    chart.  Id.

10    Shubin states that the database program is able to detect
11    differences not due to the use of the challenged conversion chart.
12    Id. at ¶ 8.  For example, he explains, in a given day an
13    arithmetical error may result in one hour of time being subtracted
14    (or added) from an employee's time.  Id.  The database program can
15    detect the error and isolate it from any loss due to the conversion
16    chart on that day.  Id.  Thus, any loss due only to the use of the
17    challenged conversion chart can be reported.  Id.

18    The program can also be used to compute the total unpaid time
19    or unpaid overtime resulting from use of the challenged conversion
20    chart for any period of time over which the database contains data.
21    Id. at ¶ 9.  A loss of overtime can be determined if the employee
22    worked forty or more hours in any given work week and there was a
23    net underpayment due to the use of the conversion chart for that
24    week.  Id.

25    The calculation logic performs a series of steps to determine
26    the number of minutes lost due to the challenged conversion chart.
27    Id. at ¶ 12.  Each day for each employee is considered one record.
28    Id. at ¶ 11.  After several steps, the logic determines whether

7 - FINDINGS & RECOMMENDATION/ORDER

there is a difference in minutes between the calculated hours worked and the amount reported by the employee for payment. Id. at ¶ 12e.  If there is no difference, the program skips to the next record.  Id. at ¶ 12f.  If there is a non-zero difference, the program looks up a "non-zero difference value" in a "Lookup Table" which returns one value for "rounding error," and one value for a "non-rounding difference."  Id. at ¶ 12g.

The "Lookup Table" provides a value for rounding and non-rounding differences in hours actually worked and hours reported for pay.  Id. at ¶ 13.  Shubin explains that because of the structure of the challenged conversion chart, rounding differences can be no greater than 5 minutes.  Id. For example, if an employee worked 8 hours and 15 minutes, the challenged conversion chart would result in 8.2 hours as the total reported hours for that day. Id. Because 8.2 hours is actually 8 hours and 12 minutes (2/10 of an hour being equivalent to 12 minutes), the employee has "lost" 3 minutes of pay.  Id.

Given the 5 minute maximum for rounding losses, Shubin asserts that differences greater than 6 minutes include a rounding loss and a non-rounding loss (such as one attributable to an arithmetical error).  Id. He further asserts that non-rounding differences are in multiples of 6 so that in a particular example where the difference in actual hours worked and the hours reported for pay is 14 minutes, the rounding loss would be 2 minutes and the non-rounding loss would be 12 minutes.  Id.  He includes the "Lookup Table" for differences from 0 to 30 minutes.  Id.

Using the database program and its calculation logic, Shubin generated a number of reports including a Timesheet Summary by

8 – FINDINGS & RECOMMENDATION/ORDER

Employee, a Timesheet by Week, and a Timesheet Review. Id. at ¶
14. The Timesheet Summary by Employee shows, by totals for each
employee: (1) the amount of time reported by the employee for
payment in hours and tenths; (2) the amount of time reported by the
employee for payment converted to hours and minutes from hours and
tenths; (3) the amount of time actually worked in hours and
minutes; (4) the difference in time between the hours and minutes
actually worked and the hours and minutes reported by the employee
for payment, attributable to the challenged conversion chart; (5)
the difference in time between the hours and minutes actually
worked and the hours and minutes reported by the employee for
payment, not attributable to the challenged conversion chart; (6)
whether any overtime was lost as a result of the challenged
conversion chart; and (7) the total amount of time, in hours and
minutes, the employee was overpaid or underpaid. Id. at ¶ 16.

The Timesheet by Week report contains week-by-week data for
each employee. Id. at ¶ 17. For each employee, there is a row
with the employee's name and exhibit number, followed by rows
containing data for particular work weeks. Id. This report
contains the same types of information as in the Timesheet Summary
by Employee. Id. The Timesheet Review has day-to-day data for
each employee. Id. at ¶ 18.

In a supplemental declaration filed with plaintiffs' reply
memorandum, Shubin explains that he produced new reports following
review of defendant's response to plaintiffs' renewed motion. The
purpose of his revision was to have the database reports more
clearly identify any positive differences of total time
attributable to the use of the challenged conversion chart. Shubin

9 - FINDINGS & RECOMMENDATION/ORDER

Supp'l Declr. at ¶ 3. Any difference in time between the hours and minutes actually worked and the hours and minutes reported by the employee for payment as a result of the challenged conversion chart, is now shown in two separate columns, one called "Round Time Plus" and another called "Round Time (Minus)." These show positive and negative differences, respectively, in the time between the hours and minutes actually worked and the hours and minutes reported by the employee for payment. Id. at ¶ 3. The "Total Over Pay (Under Pay)" column includes the data from the "Round Time Plus" column in the net calculation displayed. Id.

Shubin opines that the database program can be used to correctly and mechanically compute the individual damages of the individual employees due to the use of the challenged conversion chart. Id. at ¶ 4. The calculations would include, but are not limited to, (1) identifying the "positive rounds" of each individual employee, and either including them or not including them in net calculations of damages for the individual employees; (2) accurately calculating net damages for each collective action member regardless of whether the minutes portion of the total time is on the half-hour, quarter-hour, or on five-minute intervals; and (3) coding different types of weekly time reports and using different mathematical formulaes or algorithms to identify rounds, compute net rounding, or to perform other calculations depending on the particular type of weekly time report at issue. Id.

C. Database Capability

Leonard Shapiro, a database expert and a computer science professor at Portland State University, states that he has reviewed Shubin's program, particularly the Visual Basic source code, the

10 - FINDINGS & RECOMMENDATION/ORDER

1  pseudocode describing the logical operations performed by the
2  source code, and the data as displayed in the accompanying
3  Microsoft Access database and Shubin's declaration. Shapiro Declr.
4  at ¶ 3. He also consulted with Shubin regarding the source code.
5  Id. He was hired to opine on the "functionality" provided by the
6  logic of the source code. Id.

7      Shapiro notes that the database program is able to detect
8  differences in time not due to the use of the conversion chart.
9  Id. at ¶ 4c. For example, he states, an arithmetical error may
10 result in one hour of time being subtracted from any loss due to
11 use of the defendant's conversion chart on a given day. Id. That
12 arithmetical error can be detected and isolated from any loss due
13 to the use of the challenged conversion chart. Id. Then, any loss
14 due only to use of the conversion chart on that day can be
15 reported. Id.

16     He states that the database program can be used to compute the
17 total unpaid time and/or overtime resulting from the use of the
18 challenged conversion chart for any period of time over which the
19 database contains data. Id. at ¶ 4d. A loss of overtime would be
20 determined when the employee worked 40 or more hours in any given
21 work week and there was a net underpayment due to the use of the
22 conversion chart for that week. Id.

23     Shapiro opines that the database program would provide the
24 same functionality regardless of whether the database contained
25 records for 10,000 or 80,000, or more, employees of defendant. Id.
26 at ¶ 6. According to Shapiro, the program does not stretch the
27 limits of modern database technology. Id.
28     C.  Statistical Analysis Of Data

11 - FINDINGS & RECOMMENDATION/ORDER

1    Robert Fountain, Ph.D, a Portland State University math
2    professor, submits a declaration containing a statistical analysis
3    of the data generated by the program designed by Shubin. He first
4    states that because the challenged conversion chart <u>always</u> results
5    in a rounding down of hours, mathematically or statistically
6    speaking, the policy is one of "truncation" rather than rounding.
7    Exh. B to Fountain Declr. at p. 1. Thus, he states, if an employee
8    works 6 hours and 15 minutes, the time is truncated to 6.2 hours
9    under the challenged conversion chart, which Fountain equates to 6
10   hours and 12 minutes, causing the employee to lose 3 minutes of
11   pay. <u>Id.</u>

12      Fountain then assumes that losses of 0, 1, 2, 3, 4, and 5
13   minutes are equally likely. <u>Id.</u> Based on that assumption, he
14   states that the average loss is 2.5 minutes per shift. <u>Id.</u> If an
15   employee works 5 shifts per week, the employee loses an average of
16   7.5 minutes per week. <u>Id.</u> At 50 weeks per year, the employee
17   loses 6.25 hours, or 375 minutes, per year. <u>Id.</u>

18      Fountain then offers an opinion on the probability of
19   underpayment. <u>Id.</u> He states that there is a 20%, or 1 in 5,
20   chance of an employee being paid for his or her entire shift. <u>Id.</u>
21   "Assuming that the number of minutes of loss on one day doesn't
22   affect the loss on other days, the probabilities will be
23   multiplicative." <u>Id.</u> He concludes that only 3 or 4 out of 10,000
24   employees would be expected to receive their full pay in any
25   particular five-day week. <u>Id.</u> at pp. 1-2.

26      Fountain states that 78 of the 131 employees had a net
27   underpayment due to the challenged conversion chart during at least
28   one work week of the six-month period for which there are records.

12 - FINDINGS & RECOMMENDATION/ORDER

Exh. C at p. 1.  He also states that the number 78 represents only a "lower bound" of the actual number of the 131 individuals affected, meaning he verified the results for these 78 employees but there may be more employees with a net loss in at least one work week in that original group of 131.  _Id._  He notes that 78/131 = 59.54%.  _Id._

As to the overtime claim, he states of the 131 individuals, there were 25 who had a net underpayment of overtime due to the conversion chart during at least one work week of the six-month period.  Exh. C at p. 2.  Employees in this category had to have worked more than 40 hours in one work week and must have had a net underpayment for the week as represented in the "Total Over Pay (Under Pay)" column.  _Id._

In a supplemental declaration, Fountain reviewed 2021 records of daily time information for 79 employees.  Exh. D to Fountain Supp'l Declr. at p. 1.  103 of those records were for days where the time worked was 0.  _Id._  From a review of the remaining 1918 records, Fountain created a table showing the frequency distribution of the "minutes" portion of the time worked.  _Id._  It shows, for example, 898 out of 1918 records with 0 minutes and 519 out of 1989 records with 3 minutes.  _Id._ at p. 3.  Based on the frequency chart, Fountain calculated the number of minutes that would be lost if the time were rounded down to the nearest tenth of an hour.  _Id._  For example, the 0s and 30s would result in no loss, the 58s would result in 4 minutes lost, etc.  _Id._

Fountain then calculated the frequency of a particular loss. _Id._ at pp. 2-3.  For example, 0 minutes lost occurred in 898 out of 1918 records, or in 46.81% of the records.  _Id._ at p. 3.  5 minutes

13 - FINDINGS & RECOMMENDATION/ORDER

1  lost occurred in 88 out of 1918 records, or in 4.58% of the

2  records.  Id.

3      Fountain explains that his first declaration contained an

4  error in computing the average loss per week.  Id. at p. 3.

5  Although it was stated that the average weekly loss was based on

6  the employee working 5 shifts per week, the calculation was

7  actually performed based on 3 shifts per week.  Id.  In the

8  supplemental declaration, Fountain no longer assumes that the

9  losses of 0, 1, 2, 3, 4, or 5 minutes were equally likely.  Rather,

10 based on his new calculations regarding the frequency of minutes

11 lost, he calculates that the expected loss per shift is 1.63

12 minutes.  Id.  At five shifts per week, the average loss is 8.17

13 minutes and at 50 weeks per year, the average loss is 6.81 hours or

14 408.62 minutes.  Id.

15     In his supplemental declaration, Fountain calculates that

16 there is a 46.8% change that an employee will be paid for his

17 entire shift.  Id. at p. 4.  For a week of 5 shifts, there is a

18 2.25% chance of an employee being paid for every minute worked.

19 Id.

20 II.  Evidence Regarding The Weekly Time Reports

21     In the July 27, 2004 Findings & Recommendation, I noted that

22 while plaintiffs had narrowed their notice request to only those

23 putative class members using a particular weekly time report, the

24 undisputed evidence was that there were at least four different

25 weekly time reports in use during the relevant time period.[1]  All

26

27     [1]  The relevant time period is three years prior to the
   filing of the case, which was on May 11, 2004.  As explained more
28 fully herein, but I note here for clarification, I discuss the

14 - FINDINGS & RECOMMENDATION/ORDER

1   four versions were available to employees on-line since 2001.

2   Although defendant did not know when each of the various forms was

3   actually put on-line or taken off-line, the undisputed evidence was

4   that sometimes, employees printed a particular version of a weekly

5   time report and continued to use it by making photocopies of it,

6   even after defendant had replaced it with a different version, in

7   contravention of defendant's instruction to use the current

8   version.

9        Although the various versions of the time reports suggest that

10  the employee is to convert his or her total time worked from hours

11  and minutes to hours and tenths, different versions of the weekly

12  time reports have different "tenths" conversion charts.  The one

13  for which notice was sought in plaintiffs' first notice motion had

14  a place to record the employee's start time, time out for lunch,

15  time back in from lunch, and work end time.  The form instructed

16  that "[e]mployees should record their In and Out times above.  Time

17  should be rounded to the nearest tenth of an hour." July 27, 2004

18  F&R at p. 25.

19       The "tenths" conversion chart on the weekly time report at

20  issue in the first notice motion provided that 0-5 minutes were to

21

22  ———————————————

23  other weekly time reports that were used during the relevant time
    period because even though plaintiffs limit the requested notice
24  to those employees who used the challenged chart, I conclude that
    the policy at issue is one of rounding to the nearest tenth, not
25  one of rounding down, and I further conclude that it is necessary
    to review the weekly time reports over a period of time in order
26  to determine if there has been an actionable wage loss,
    particularly as to the minimum wage claim.  Because weekly time
27  reports other than those with the challenged chart were used
    during the relevant time period, I discuss all of the weekly time
28  reports.

15 - FINDINGS & RECOMMENDATION/ORDER

1   be recorded as "0," 6-11 minutes as "0.1", 12-17 minutes as "0.2",

2   18-23 minutes as "0.3", 24-29 minutes as "0.4," 30-35 as "0.5", 26-

3   41 as "0.6," 42-47 as "0.7," 48-53 as "0.8," and 54-59 as "0.9."

4   This is the same conversion chart at issue in the present motion.

5       In the July 27, 2004 Findings & Recommendation, I stated that

6   use of this particular conversion chart could result in no time

7   adjustments if the employee's time were "straightforward" and

8   accurately reported.  July 27, 2004 F&R at pp. 27-28 & n.3 (giving

9   example of an employee in at 8, out at 12, in at 1, out at 5, for

10  a total of 8 hours and 0 minutes and recorded as 8.0).  However, I

11  also noted that an employee who followed the instructions and

12  recorded their in and out time accurately, would round their time

13  down to their detriment in other cases.  Id.

14      Additionally, I explained that given the instruction on the

15  time chart at issue in the first notice motion that employees are

16  to record their in and out times and round their time to the

17  nearest tenth of an hour, some employees may have reasonably

18  interpreted the instruction to convert not just their daily total

19  of hours worked, but also their beginning, lunch out, lunch in, and

20  work ending times (e.g. an employee who starts work at 8:05 could

21  rely on the conversion chart showing that 0-5 minutes are to be

22  recorded as "0" and record the start time as 8:00 a.m., thus

23  rounding up).  Id.

24      Finally, I stated that the other weekly time reports with

25  different conversion charts also allowed for no rounding, rounding

26  down, or rounding up, depending on how they were used.  Id. at pp.

27  27-29.

28      As explained in the July 27, 2004 Findings & Recommendation,

16 - FINDINGS & RECOMMENDATION/ORDER

1  the undisputed facts that several time charts were in use, that
2  other time charts did not produce consistent rounding down, that
3  employees could adjust their start and stop times by use of the
4  chart instead of their total time for the day, and that the time
5  chart at issue itself did not consistently produce a rounding down
6  of time worked if the employee's total daily time ended in 0 or 30
7  minutes worked, presented major obstacles to plaintiffs' ability to
8  prevail in the first notice motion. Because of their presence, I
9  concluded that individual inquiries predominated over any
10 collective issues and thus, plaintiffs could not meet the similarly
11 situated standard required for FLSA collective action notice. Id.
12 at 31-32.

13     In an attempt to overcome these issues in this renewed motion,
14 plaintiffs rely on the deposition testimony of several managers or
15 former managers for defendant, to show that management ensured the
16 proper weekly time report form was used, that starting and ending
17 times were entered correctly, that the conversion chart was used
18 correctly, and that management was required to check and approve
19 all time records, and thus all math errors. The cited deposition
20 excerpts do not support plaintiffs' contentions.

21     For example, plaintiffs contend that weekly time reports with
22 the offending conversion chart were in use at least in 2002 and
23 2003. Although I do not see that defendant disputes that the
24 offending conversion chart was used, along with other charts, in
25 2002 and 2003, I assume that plaintiffs want to show that the
26 offending conversion chart was used for a majority of the time in
27 2002 and 2003. In support of their contention, plaintiffs cite to
28 the deposition testimony of Karen Holberton who was the branch

17 - FINDINGS & RECOMMENDATION/ORDER

1   manager in Central Point.  She was questioned regarding the use of
2   a particular conversion chart and weekly time report.[2]

3       Holberton testified that the form she was being shown was the
4   form used to report time in 2002 at the Central Point branch that
5   she supervised.  Holberton Depo. at p. 15.  She did not remember
6   when it "came into play."  Id.  One page of the exhibit showed a
7   week ending date of May 10, 2003, and Holberton agreed that this
8   was the weekly time report used in May 2003, and used for all of
9   her hourly employees while she was manager at the Central Point
10  branch.  Id. at pp. 15-16.  On another page, there was a conversion
11  chart.  She agreed that that conversion chart was used in May 2003
12  but she did not remember whether a conversion chart carrying an
13  explanation of use was used during her tenure at the branch.  Id.
14  at p. 16.  Later in her deposition, however, Holberton specifically
15  testified that she did not remember when this time report was used.
16  Id. at p. 71.  She stated that the deposition exhibit that she had
17  been testifying about earlier had, in fact, not been used the
18  entire time she was manager at Central Point, that other weekly
19  time reports were used at various times when she was manager, and
20  that she did not remember exactly when that one was used.  Id. at
21  pp. 70-71.

22      Holberton's testimony can be used to support the point that a
23  particular weekly time report, presumably one with the challenged
24  conversion chart, was used at some point while she was branch
25  manager at the Central Point branch in 2002 and 2003, and likely

26  _____

27      [2]  The deposition exhibit to which her testimony is directed
    does not appear to be appended to the deposition excerpts
28  provided to the Court.

18 - FINDINGS & RECOMMENDATION/ORDER

during May 2003, but that she does not remember if the conversion chart that appeared on that weekly time report had an explanation of how to use it. More importantly, her testimony establishes that other weekly time reports were used as well. Her testimony does not support plaintiffs' proposition that the challenged conversion chart was used predominantly or a majority of the time or exclusively during 2002 and 2003, even at the Central Point branch, much less at any other branches. The fact that she did not identify the other weekly time reports or conversion charts highlights the necessity of the individualized inquiry required by plaintiff's motion because, at least as Holberton's deposition reveals, any and all of the weekly time reports that were issued during the relevant time period could have been used.

In another example, plaintiffs rely on Holberton's testimony to show that hourly employees were trained in how to use the offending conversion chart. Holberton was asked if employees at her branch were trained on how to use the conversion chart or instructed to use the conversion chart. She answered yes to this compound question. In response to the next question of what her employees were told, she said "[t]hey were told to follow the chart." Id. at p. 28. This simplistic "instruction" does not amount to "training" in how to use the challenged conversion chart.

Other propositions put forth by plaintiffs are similarly unsupported. Thus, the undisputed evidence in the record remains that during the relevant time period, several time charts with different conversion charts were used, only the challenged conversion chart consistently produces a rounding down of time, and the challenged conversion chart itself produces no rounding for

19 - FINDINGS & RECOMMENDATION/ORDER

1   employees whose daily total time of minutes equals the number of
2   minutes represented by any tenth of an hour.  That is, an employee
3   who worked 6 hours and 0 minutes, 6 hours and 6 minutes, 6 hours
4   and 12 minutes, 6 hours and 18 minutes, 6 hours and 24 minutes, 6
5   hours and 30 minutes, 6 hours and 36 minutes, 6 hours and 42
6   minutes, 6 hours and 48 minutes, or 6 hours and 54 minutes, would
7   have no rounding down of time if they used the challenged
8   conversion chart accurately.  Plaintiffs' additional evidence does
9   not change these undisputed facts.

10  III.  The Policy at Issue

11      As noted above, plaintiffs change the focus of their claim in
12  the Second Amended Complaint from a particular weekly time report
13  to a particular conversion chart.  They also shift verbiage from
14  what they previously called "rounding" claims to what they now call
15  "truncation" claims.  Based on Fountain's declaration in which he
16  explains that the conversion chart creates a truncation policy
17  because it consistently rounds time down, plaintiffs contend that
18  the policy at issue here is a truncation policy.  I reject this
19  argument.

20      In the July 27, 2004 Findings & Recommendation, I noted that
21  defendant maintained a policy of requiring employees to round their
22  time to the nearest tenth of an hour.  July 27, 2004 F&R at p. 24
23  (citing Marcia Kakiuchi Declaration and Exhibits to Kakiuchi
24  Declaration).  No additional evidence on this issue has been
25  tendered with the renewed notice motion.  Thus, the record remains
26  that defendant's policy is a general one which requires employees
27  to round their time to the nearest tenth.  This is also supported
28  by the fact that during the relevant time period, employees used

20 - FINDINGS & RECOMMENDATION/ORDER

1   several different weekly time reports with various conversion

2   charts, with only the challenged conversion chart producing a

3   consistent rounding down of time actually worked.   I view the

4   challenged conversion chart as an aberrant implementation of the

5   more general policy requiring employees to round their time to the

6   nearest tenth of an hour.   Thus, the policy is not a rounding down

7   or truncation policy.

8   IV.   Standards for FLSA Collective Actions

9        The FLSA provides, in pertinent part:

10       Any employer who violates the provisions of section 206
         or section 207 of this title shall be liable to the
11       employee or employees affected in the amount of their
         unpaid minimum wages, or their unpaid overtime
12       compensation, as the case may be, and in an additional
         equal amount as liquidated damages. Any employer who
13       violates the provisions of section 215(a)(3) of this
         title shall be liable for such legal or equitable relief
14       as may be appropriate to effectuate the purposes of
         section 215(a)(3) of this title, including without
15       limitation employment, reinstatement, promotion, and the
         payment of wages lost and an additional equal amount as
16       liquidated damages. An action to recover the liability
         prescribed in either of the preceding sentences may be
17       maintained against any employer (including a public
         agency) in any Federal or State court of competent
18       jurisdiction by any one or more employees for and in
         behalf of himself or themselves and other employees
19       similarly situated. No employee shall be a party
         plaintiff to any such action unless he gives his consent
20       in writing to become such a party and such consent is
         filed in the court in which such action is brought.
21
     29 U.S.C. § 216(b) (emphasis added).
22

23       As noted by the Ninth Circuit, the "FLSA authorizes an

24   employee to bring an action on behalf of similarly situated

25   employees, but requires that each employee opt-in to the suit by

26   filing a consent to sue with the district court.  See 29 U.S.C. §

27

28

     21 - FINDINGS & RECOMMENDATION/ORDER

1  216(b)."[3]  <u>Does I Thru XXIII v. Advanced Textile Corp.</u>, 214 F.3d

2  1058, 1064 (9th Cir. 2000).   "To facilitate this process, a

3  district court may authorize the named plaintiffs in an FLSA

4  collective action to send notice to all potential plaintiffs, <u>see</u>

5  <u>Hoffmann-La Roche Inc. v. Sperling</u>, 493 U.S. 165, 169, 110 S. Ct.

6  482, 107 L. Ed. 2d 480 (1989), and may set a deadline for

7  plaintiffs to join the suit by filing consents to sue, <u>id.</u> at 172,

8  110 S.Ct. 482."  <u>Id.</u>  Thus, here, plaintiffs file this "<u>Hoffman-</u>

9  <u>LaRoche</u>" motion to authorize notice to be sent to all potential

10  plaintiffs.

11      "In determining whether or not to certify a collective action,

12  the core inquiry is whether the putative class members are

13  'similarly situated.'"  <u>Sheffield v. Orius Corp.</u>, 211 F.R.D. 411,

14  413 (D. Or. 2002).  As further explained in <u>Sheffield</u>:

15      This court considers the term 'similarly situated' in
        light of the purposes and goals of a collective action.
16      The Supreme Court has recognized that class actions can
        be an efficient mechanism for resolving a number of
17      disputes in one consolidated action.  <u>See Hoffman-La</u>
        <u>Roche</u>, 493 U.S. at 170, 110 S. Ct. 482; <u>see also Daggett</u>
18      <u>[v. Blind Enterprises of Or.]</u>, 1996 U.S. Dist. LEXIS
        22465, at *17 [D. Or. 1996].   However, an action
19      dominated by issues particular to individual plaintiffs
        can not be administered efficiently because individual
20      issues predominate over collective concerns.
            Putative class members must share more than a common
21      allegation that they were denied overtime or paid below
        the minimum wage.   The class members must put forth a
22      common legal theory upon which each member is entitled to
        relief.
23
    <u>Sheffield</u>, 211 F.R.D. at 413.
24
        The 'similarly situated' standard is less stringent than the
25

26  _____

27      [3]  Unlike class actions certified under Federal Rule of
    Civil Procedure 23, an individual may become a party plaintiff in
28  an FLSA collective action only if he or she files a "consent in
    writing," i.e., "opts-in." 29 U.S.C. § 216(b).

    22 - FINDINGS & RECOMMENDATION/ORDER

requirement under Federal Rule of Civil Procedure 23(b)(3) that common questions of law or fact predominate over questions affecting only individual members. Ballaris v. Wacker Siltronic Corp., No. 00-1627-KI, 2001 WL 1335809, at *2 (D. Or. Aug. 24, 2001). In fact, the Eleventh Circuit has held that the similarly situated requirement is more flexible than the requirements of Rule 20 (joinder) and Rule 42 (severance). Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996).

Nonetheless, plaintiffs are required to show through admissible evidence a "reasonable basis" for their claim that the employer acted on a class-wide basis. Hargrove v. Sykes Enterprises, Inc., No. CV-00-11-HA, 1999 WL 1279651, at *3 (D. Or. June 30, 1999). Plaintiffs' claims "must contain questions of both law and fact which are common to all employees engaged in the same character of work." Id. (internal quotation omitted). The burden is on plaintiffs to show they are similarly situated. Id. Unsupported allegations of widespread violations are insufficient. Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

V.   Proposed Notice

Plaintiffs seek to notice the following:

"All non-exempt employees who work or worked for US Bank National Association in the states of Oregon, Washington, and/or California within the three-year period prior to the filing of plaintiffs' complaint and who used a weekly time report with the following conversion chart:

23 - FINDINGS & RECOMMENDATION/ORDER

| Minutes | 10ths |
|---------|-------|
| 0-5     | 0     |
| 6-11    | 0.1   |
| 12-17   | 0.2   |
| 18-23   | 0.3   |
| 24-29   | 0.4   |
| 30-35   | 0.5   |
| 36-41   | 0.6   |
| 42-47   | 0.7   |
| 48-53   | 0.8   |
| 54-59   | 0.9   |

Pltfs' Mem. at pp. 18-19.

The essence of plaintiffs' argument in this motion is that all employees who used the challenged conversion chart are similarly situated to McElmurry[4] because based on the calculations performed by Shubin's database and Fountain's opinions in interpreting the data, the challenged conversion chart has caused an actionable wage loss for all employees who have used it. While Fountain acknowledges that the raw data may be considered a "probe" or "preliminary" sample," he contends that the sample of 132 employee records is nonetheless a representative sample, and is sufficient for him to extrapolate from that sample to calculate the probability that an employee has suffered an underpayment. For the reasons discussed below, I conclude that plaintiffs fail to meet their burden of establishing the "similarly situated" standards.

_____

[4] Putative class members would be similarly situated only to McElmurry because Mrazek does not bring a claim based on the challenged conversion chart.

24 - FINDINGS & RECOMMENDATION/ORDER

VI.  Discussion

As can be seen from the proposed notice, plaintiffs seek to send notice only to those employees who have used the challenged chart.  Certainly, to be similarly situated to McElmurry, the putative class members must have used this chart.  However, to determine which employees used the challenged conversion chart sufficiently often during the relevant time period requires an individualized inquiry.

As recited above, the evidence is that different charts were used by employees at various times during the relevant time period. Even if defendant's human resources department could discern the precise time period(s) the offending conversion chart was available to employees, the undisputed evidence is that employees may have continued to use older charts after replacement by newer ones. Thus, regardless of what weekly time report with what conversion chart was supposed to be used, determining which employees used the challenged conversion chart will require an inquiry into the weekly time report records of all non-exempt hourly employees in three states during the relevant time period.

Assuming the employees who used the challenged conversion chart during the relevant time period were discernable by some other non-individualized inquiry method, the fact remains that despite Shubin's calculations and Fountain's probabilities, determining which of these employees are similarly situated to McElmurry in terms of having suffered an underpayment still requires a level of individualized inquiry incompatible with the purposes for which collection actions are to be maintained.

Notice to putative class members is not a means to discover

25 - FINDINGS & RECOMMENDATION/ORDER

1  which employees are similarly situated to the named plaintiff.

2  Rather, the purpose of such notice is to inform those who are

3  already determined to be similarly situated, of their right to opt-

4  in to the class.  Thus, in this case, notice must be sent not to

5  all of defendant's non-exempt hourly employees in Oregon,

6  Washington, and California who, during the relevant time period,

7  have at some point used the challenged conversion chart, but to

8  those who have used the challenged conversion chart for enough of

9  the relevant time period to produce consistent rounding down.

10      Plaintiffs' new evidence submitted by Shubin and Fountain does

11  not change the need for that individualized inquiry.  Although

12  Shubin's database makes calculations for each similarly situated

13  employee easier and faster, his program still relies on a review of

14  the underlying individual weekly time reports of employees.

15      Plaintiffs contend that a review of weekly time reports with

16  the challenged conversion chart over a period of time is

17  unnecessary.  Plaintiffs contend that because the challenged chart

18  consistently produces an underpayment of wages for time worked, it

19  is, as Fountain stated, a "truncation" policy and not a "rounding"

20  policy which would allow for both overpayments and underpayments.

21  Because it is not a rounding policy in plaintiffs' view, 29 C.F.R.

22  § 785.48(b), which provides that a rounding practice of recording

23  employees' starting and stopping time to the nearest five minutes,

24  tenth of an hour, or quarter hour, is acceptable provided that it

25  is used in such a manner that it does not result, over a period of

26  time, in the failure to compensate the employee properly for all

27  the time the employee has actually worked, does not apply.  Because

28  the regulation does not apply according to plaintiffs, each work

26 - FINDINGS & RECOMMENDATION/ORDER

week stands on its own and any week in which a non-exempt hourly
employee used the challenged conversion chart establishes FLSA
liability. I disagree with plaintiffs on this point.

As explained above, while this particular conversion chart
causes employees whose total minutes for the day are not measured
precisely in even tenths of an hour to lose time, this is only one
of several conversion charts used during the relevant time period.
That, along with the undisputed evidence that the expressed general
policy is to round to the nearest tenth of an hour, compels a
conclusion that the "policy" at issue here is not limited to the
result produced by the challenged conversion chart. Rather, the
company's policy is simply to round to the nearest tenth of an
hour, with this particular conversion chart producing a downward
round in cases other than when the employee's actual minutes worked
are in multiples of six minutes. Thus, 28 C.F.R. § 785.48(b)
applies and a review of time reports "over a period of time" is
required to determine if other non-exempt hourly employees are
similarly situated to McElmurry in sustaining an actionable loss.
Put simply, if an employee used the conversion chart plaintiffs
complain of for 4 weeks, and lost 35 minutes per week, but used
another chart for 52 weeks and it showed a net "rounding up" of 42
minutes, there would be no loss and this hypothetical employee
would not be similarly situated to McElmurry.

Furthermore, I reject plaintiffs' reliance on 29 C.F.R. §
778.104 as controlling for the minimum wage claim. That regulation
provides that the FLSA "takes a single workweek as its standard and
does not permit averaging of hours over 2 or more weeks." 29
C.F.R. § 778.104. Plaintiffs argue that under this regulation,

27 - FINDINGS & RECOMMENDATION/ORDER

1  defendant cannot average an underpayment in one week against an
2  overpayment in another week.  On its face, this regulation appears
3  to contradict 29 C.F.R. § 785.48(b) regarding the allowance of
4  certain rounding policies.  29 C.F.R. § 778.104 is easily
5  reconciled with 29 C.F.R. § 785.48(b), however, because section
6  778.104 applies only to overtime compensation and does not control
7  issues related to recording working time.  Thus, the "over a
8  period of time" standard remains relevant and requires an
9  examination of each non-exempt hourly employee's weekly time
10 reports to determine the proportion of time during the relevant
11 time period that the challenged conversion chart was actually used.

12     While plaintiffs' suggest that their evidence shows that a
13 majority of the non-exempt hourly employees used the challenged
14 conversion chart a majority of the time, and thus a majority of the
15 non-exempt hourly employees are similarly situated to McElmurry
16 even considering their weekly time reports over a period of time,
17 plaintiffs' evidence is problematic in several respects.

18     First, I cannot tell from this record what the start and stop
19 times on the weekly time reports actually show in terms of hours
20 and minutes worked.  On the one hand, it is true that the weekly
21 time reports in the record, as signed by both the employee and the
22 employee's supervisor, are the only evidence of the start and stop
23 times.  It is reasonable to assume that if each employee were to
24 testify, the employee would not have an independent recollection of
25 his or her start, lunch break, and end times for each day worked
26 several years earlier.  The recorded hours on the weekly time
27 reports are likely to be the only evidence as to start and stop
28 times.

28 - FINDINGS & RECOMMENDATION/ORDER

On the other hand, however, McElmurry testified that it was
her personal practice to adjust her start and stop times to the
nearest five-minute interval.  If she started work at 8:02, she
wrote 8:00 on her weekly time report.  McElmurry Depo. at pp. 32-
34.  If she come back from lunch at 1:02, she wrote down 1:00 on
her weekly time report.  Id.  If she came back at 1:03, she would
likely write 1:05.  Id.  Although there is no testimony from other
employees regarding this practice, the weekly time reports from the
other employees indicate that some personal adjustment to start and
stop times is highly probable given that of the 79 employees
plaintiffs chose for their sample, very few have time ending in
something other than on the hour, the quarter-hour, or a five-
minute interval.  Thus, more likely than not, employees did not
record their start and stop times to the nearest minute.  Exactly
how employees other than McElmurry recorded their start and stop
times is not clear in this record.

The ambiguity in the record regarding the stop and start time
undermines Fountain's opinions and probabilities because he assumes
employees recorded their start and stop times to the minute.  Exh.
B to Fountain Declr. at p. 1 ("We will assume that whenever an
employee works a shift, his or her time will be clocked to the
nearest minute.").  His assumption is contradicted by a review of
the weekly time reports and by McElmurry's deposition testimony.
Thus, I place little reliance on the statements in his declaration
and his supplemental declaration.

Second, it is undisputed that plaintiffs, while choosing
records of 79 of 131 employees, did not enter into the database all
of the weeks those 79 employees worked.  For example, plaintiffs

29 - FINDINGS & RECOMMENDATION/ORDER

1  used the weekly time reports for employee Vyasa Dodson as one of

2  the 79 employees comprising their representative sample.  Exh. 14

3  to Pinney Declr.; Exh. D to Shubin Declr. at p. 4.  Plaintiffs

4  concluded that, ignoring overpayments attributable to Dodson's

5  timekeeping practices[5], Dodson lost 20 minutes of time due to the

6

7      [5]  A review of plaintiffs' underlying data shows that
plaintiffs subscribe a somewhat selective meaning to what they

8  term "overpayments attributable to Dodson's timekeeping
practices."  In Exhibit D to Shubin's Declaration, the "Timesheet

9  by Week" for Dodson shows, for the week ending March 22, 2003,
that she lost 8 minutes to rounding and had no other non-rounding

10  losses or additions to her time worked.  The actual weekly time
report for that week is found at Exhibit 15, page 1 to Pinney's

11  Declaration.  There, it shows that plaintiff worked 7 hours and
45 minutes on March 17, 2003.  Exh. 15 to Pinney Declr. at p. 15.

12  The challenged conversion chart appears on that weekly time
report and if used properly, would require plaintiff to record

13  her time for that day as 7.7 hours worked.  Id.  But, plaintiff
inexplicably recorded 7.8 hours for that day, producing a

14  "rounding up" of 3 minutes.  Id.  On Tuesday, March 18, 2003, she
worked 7 hours and 10 minutes and properly recorded that pursuant

15  to the chart as 7.1 hours.  Id.  On March 19, 2003, she worked 5
hours and 0 minutes and properly recorded that as 5.0 hours.  Id.

16  On March 20, 2003, she worked 7 hours and 10 minutes and recorded
it, again pursuant to the chart, as 7.1 hours.  Id.  And on

17  Friday, March 21, 2003, she worked 8 hours and properly recorded
that as 8 hours.  Id.  She claimed a total of 35 hours for the

18  week based on her daily totals of 7.8, 7.1, 5.0, 7.1, and 8.0
hours.  Id.  The 8 minutes referred to in Exhibit D must refer to

19  the loss of 4 minutes for the two days that she worked 7 hours
and 10 minutes but recorded that as 7.1 because the 0.1 tenth

20  part of that 7.1 hours can, at best, provide pay for up to 6
minutes, not 10 minutes.  Because this occurred on 2 days in that

21  week, she lost 8 minutes.  Although the evidence clearly shows
that due to her "timekeeping practices" she recorded 7.8 hours

22  for March 17, 2003, when she should have recorded 7.7, Shubin's
calculations do not account for that extra 3 minutes she claimed.

23      This is seen again in the evidence supporting the conclusion
shown in Exhibit D for Dodson for the week ending March 29, 2003.

24  Plaintiffs report that she lost 8 minutes of time due to rounding
down, and that she had 15 minutes of "rounding up" due to her

25  timekeeping practices.  In that week, Dodson worked 8 hours and

26  10 minutes on March 24, 2003.  Id.  She recorded, pursuant to the

27

28

30 - FINDINGS & RECOMMENDATION/ORDER

1   challenged conversion chart.  Exh. D. to Shubin Declr. at p. 4.

2   But, plaintiffs included only three weeks of her weekly time

3   reports in their calculations, omitting, for example, the weekly

4   time report for the week ending March 1, 2003, which shows that

5   Dodson gained minutes of time in that week when using the

6   challenged conversion chart.  The minutes of time gained are from

7   errors described in footnote 5 such as working 6 hours and 40

8   minutes and recording that as 6.7 hours instead of 6.6 hours.  Exh.

9   _____

10  conversion chart, 8.1 hours.  Id.  On March 25, 2003, she worked
    5 hours and 45 minutes.  Id.  She recorded 5.8 hours even though
11  the chart required her to record 5.7 hours.  Id.  On March 27,
    2003, she worked 6 hours and 40 minutes, properly recording
12  pursuant to the chart, that she worked 6.6 hours.  Id.  On March
    28, 2003, she worked 6 hours and 40 minutes bur she recorded this
13  as 6.7 hours instead of 6.6 hours pursuant to the conversion
    chart.  Id.  On March 29, 2003, she worked 5 hours and 15
14  minutes, but mistakenly recorded her time worked as 5.5 hours.
    Id.
15
         Exhibit D shows 8 minutes lost to rounding, presumably
16  attributable to the March 24, 2003 date on which plaintiff worked
    8 hours and 10 minutes and properly recorded 8.1 hours, for a
17  rounding down loss of 4 minutes, and presumably attributable to
    the March 27, 2003 date on which plaintiff worked 6 hours and 40
18  minutes and properly recorded 6.6 hours, for a rounding down loss
    of 4 minutes.  Exhibit D shows a 15 minute non-rounding
19  "overpayment" which is obviously attributable to the March 29,
    2003 date on which she worked 5 hours and 15 minutes, but
20  recorded 5.5, for a 15 minute overpayment.  What plaintiff's
    summaries and calculations ignore are the 3 minute overpayment on
21  March 25, 2003, when plaintiff worked 5 hours and 45 minutes and
    should have recorded, according to the chart, 5.7 hours worked,
22  but recorded 5.8 hours instead, producing a 3 minute overpayment,
    and the 2 minute overpayment on March 28, 2003, when plaintiff
23  worked 6 hours and 40 minutes and recorded 6.7 hours instead of
    6.6 hours.
24       Given these examples, I understand plaintiffs' reference to
    "overpayments attributable to an employee's timekeeping
25  practices" to be a fluid concept because clearly, plaintiffs'
    calculations do not reflect that actual amount of overpayments
26  that are, in my opinion, attributable to nothing other than a
    "timekeeping" error.
27
28
    31 - FINDINGS & RECOMMENDATION/ORDER

1   25 to Tina Eaton Declr.[6]

2      Because of the nature of plaintiffs' evidence, it is
3   impossible to know, from the records submitted by plaintiff,
4   whether an employee worked only the weeks plaintiffs chose to use
5   in the preparation of the data, or worked additional weeks that
6   plaintiffs excluded from the database.

7      In another example, plaintiffs included in the database four
8   weeks of data for employee Sharon Harrington. Exh. 23 to Pinney
9   Declr.; Exh. D to Shubin Declr. at p. 6. Plaintiffs conclude that
10   Harrington lost 22 minutes of time due to the challenged conversion
11   chart. Exh. D to Shubin Declr. at p. 6. Plaintiffs failed to
12   include however, the data from the weekly time report for the week
13   ending January 11, 2003, showing that Harrington actually gained
14   minutes that week when using the conversion chart. Exh. 53 to
15   Eaton Declr. And, the weekly time report for the week ending
16   February 15, 2003, shows that Harrington gained three minutes using
17   the conversion chart for February 12, 2003. Exh. 55 to Eaton
18   Declr.

19      Plaintiffs' database also included weekly time reports for
20   employee Sherrie Cross. Exh. 12 to Pinney Declr.; Exh. D to Shubin
21   Declr. at pp. 3-4. Based on the ten weeks of data for Cross that
22   plaintiffs relied on, plaintiffs conclude that Cross lost 1 hour
23   and 32 minutes as a result of the challenged conversion chart.
24   Exh. D to Shubin Declr. at p. 4. Plaintiffs omitted, however, the
25   data from the weekly time records for the weeks ending January 11,

26 ─────────────────────

27     [6] Defendant originally filed the Eaton Declaration and its
    attached exhibits as part of its response to plaintiffs'
28   objections to the July 27, 2004 Findings & Recommendations.

32 - FINDINGS & RECOMMENDATION/ORDER

1   2003, and May 10, 2003, both of which show an increase in minutes

2   when using the conversion chart.  Exhs 14, 17 to Eaton Declr.

3       Given that Shubin's assumption regarding the start and stop

4   time is belied by the record and McElmurry's testimony, and given

5   plaintiffs' failure to enter all time records from all weeks for

6   each of the 79 employees they chose to use as their sample,

7   plaintiffs' evidence does not support a conclusion that a majority

8   of the non-exempt hourly employees used the challenged conversion

9   chart a majority of the time to their disadvantage and thus, are

10  similarly situated to McElmurry.   As a result, the similarly

11  situated determination regarding the minimum wage claim still

12  requires a highly individualized inquiry which, for the reasons

13  explained in the July 27, 2004 Findings & Recommendation, is

14  incompatible with the purposes for which FLSA claims are certified

15  as collective actions.

16      Moreover, while McElmurry alleges in the Second Amended

17  Complaint that she suffered a loss of minimum wage as a result of

18  defendant's challenged conversion chart, none of the evidence

19  submitted by plaintiffs in support of their renewed notice motion

20  suggests that the challenged conversion chart caused any of the

21  putative similarly situated class members to lose minimum wages.

22      Accordingly, because defendant's policy is properly viewed as

23  a policy of rounding to the nearest tenth and not a policy of

24  consistently truncating downward, the putative class members, to be

25  similarly situated, must be those non-exempt hourly employees who

26  first, have used the challenged conversion chart, second, have used

27  it frequently enough over a period of time to produce consistent

28  rounding down, and third, have suffered a loss of minimum wage as

33 - FINDINGS & RECOMMENDATION/ORDER

1  a result.  As discussed above, plaintiffs' evidentiary submissions
2  do not support a conclusion that a majority of defendant's non-
3  exempt employees used the challenged chart a majority of the time
4  to produce a wage loss.  Thus, plaintiffs' evidence submitted in
5  support of their renewed motion does not change the need for the
6  individualized inquiries regarding the exact use of the challenged
7  chart, week by week, for a period of time, for each putative class
8  member.  Collective action certification is inappropriate in this
9  situation.

10      As for the overtime claim, I agree with plaintiffs that
11 averaging gains or losses caused by the challenged conversion chart
12 over a period of time is prohibited by 29 C.F.R. § 778.104,
13 requiring each workweek to stand alone for the purposes of
14 computing a right to overtime pay.  However, even without the need
15 to examine weekly time reports over a period of time, the overtime
16 claim presents its own individualized inquiries that are also
17 incompatible with a collective action.

18      The challenged conversion chart could cause a non-exempt
19 hourly employee to lose overtime when the employee has worked more
20 than 40 hours in one week and any rounding down caused by the chart
21 resulted in a recorded total of hours and minutes worked for that
22 week that is still more than 40 hours, but is nonetheless less than
23 the time actually worked.  The challenged chart could also cause a
24 non-exempt hourly employee to lose the ability to collect any
25 overtime in a given week if the rounding down resulted in the total
26 hours reportedly worked for that week being less than 40 when the
27 actual total worked was more than 40.

28      McElmurry contends that she and putative members of the

34 - FINDINGS & RECOMMENDATION/ORDER

1   overtime claim class, lost their overtime pay for hours worked in
2   excess of 40 hours per week as a result of the challenged
3   conversion chart.   Sec. Am. Compl. at ¶¶ 45, 47.   However,
4   determining which non-exempt hourly employees are actually
5   similarly situated to McElmurry by virtue of losing overtime pay in
6   one of the two ways described in the preceding paragraph, requires
7   an examination of each non-exempt hourly employee's weekly time
8   reports.   An overtime loss would occur only if the employee had
9   worked more than 40 hours per week, or some number of hours close
10  to that.   Shubin indicates that the maximum minutes an employee can
11  lose per shift as a result of the offending conversion chart, is 5.
12  Exh. B to Shubin Declr.   If each non-hourly exempt employee worked
13  five shifts per week, the maximum loss is 25 minutes per week.
14  Thus, the overtime claim class would be limited to those employees
15  who worked 39 hours and 36 minutes or more per week, or, using the
16  conversion chart, reported 39.5 or more hours per week.

17      The evidence plaintiffs submit in support of their renewed
18  motion shows that 25 of the 79 employees comprising the sample
19  would have an overtime claim based on the challenged conversion
20  chart.   Exh. C to Shubin Declr. at p. 2.   Plaintiffs' evidence
21  cannot be used to support a conclusion that a majority of non-
22  exempt hourly employees suffered an overtime loss.   Accordingly, a
23  week-by-week review of each individual non-exempt hourly employee's
24  weekly time reports would be required to determine if an employee
25  were similarly situated to McElmurry in terms of an overtime loss
26  caused by the chart.   First, the employees who used the challenged
27  time sheet must be identified.   Second, each weekly time report for
28  the relevant time period must be analyzed to see if the employee

35 - FINDINGS & RECOMMENDATION/ORDER

1  worked at least 39 hours and 25 minutes or recorded 39.5 hours.
2  Third, of those employees, it must be determined if there was a net
3  loss of time attributable to the challenged conversion chart,
4  actually resulting in a loss of overtime.  This last inquiry would
5  encompass another tier of inquiry regarding the employee's personal
6  practice regarding recording start and stop time as well as a
7  review for errors of the type described above regarding Dodson
8  where an employee works a certain number of hours and minutes, but
9  presumably mistakenly writes the wrong tenth when converting the
10 minutes to tenths.

11      I am mindful that such individual determinations regarding
12 damages calculations do not necessarily preclude a determination of
13 "similarly situated" for the liability phase of a collective action
14 case.  However, the identified inquiries here are liability-related
15 inquiries that would precede a damages phase, and must be used to
16 determine if the putative class member is similarly situated to
17 McElmurry for an alleged overtime violation.

18      For the reasons discussed in the July 27, 2004 Findings &
19 Recommendation, such an individualized inquiry is inconsistent with
20 a collective action.  The determination of which employees are
21 similarly situated class members requires too particular of an
22 inquiry into the specifics of each individual's weekly time report
23 history.

24      As noted in Sheffield, while the putative plaintiffs' claims
25 do not need to be identical to those of the named plaintiff,
26 factual differences may undermine the judicial efficiency which a
27 collective action is designed to promote.  211 F.R.D. at 416.  In
28 Sheffield, the factual differences in geography, work sites, and

36 - FINDINGS & RECOMMENDATION/ORDER

1  payment systems precluded a finding that the putative class members
2  were similarly situated to the named plaintiffs.  Id. at 413.

3      While the factual differences here are not so easily
4  categorized, it remains evident that "a collective action certified
5  on the facts presented thus far would be mired in particularized
6  determinations of liability and damages, rather than collective
7  consideration of common questions of law and fact."  Id.  While
8  plaintiffs' database has created a far more expeditious method of
9  analyzing the relevant data, the evidence plaintiffs submit in
10  support of this renewed motion does not change the fact that a
11  review of each weekly time report for each non-exempt hourly
12  employee for the relevant time period is required before it may be
13  said that a given employee is similarly situated to McElmurry in
14  regard to a minimum wage or overtime claim.  Such a review is at
15  odds with a collective action.

16      For the reasons discussed herein and in the July 27, 2004
17  Findings & Recommendation, I recommend that the renewed notice
18  motion be denied.
19  VII.  Tolling Motion
20      Given my recommendation that the renewed notice motion be
21  denied, I recommend that plaintiffs' motion to toll the statute of
22  limitations be denied as moot.
23  VIII.  Defendant's Motions to Strike
24      Defendant moves to strike the declarations of Shubin, Shapiro,
25  and Fountain filed in support of the renewed motion, and the
26  supplemental declarations of Shubin, Shapiro, and Fountain filed
27  with plaintiffs' reply memorandum in support of the renewed motion.
28  I deny these motions to strike as moot because even considering

37 - FINDINGS & RECOMMENDATION/ORDER

1  these declarations, I recommend that the renewed notice motion be
2  denied.

3      I grant, however, the part of the motion directed to certain
4  statements in Pinney's declaration.  Defendant moves to strike
5  paragraphs 8, 10, and 15 of Pinney's declaration as lacking in
6  foundation and containing inadmissible legal assertions.  I agree
7  with defendant.

8      In paragraph 8, Pinney states that "[e]ach time report in
9  Exhibit 1-79 shows the actual hours the employees worked[.]"
10 Pinney Declr. at ¶ 8.  Defendant contends that Pinney has no
11 personal knowledge of the actual hours the employees worked and
12 that Pinney is in no position to verify the accuracy of the time
13 reports or to authenticate them.  Plaintiffs respond that defendant
14 has waived or ratified any challenge to the accuracy of the time
15 reports because a branch manager has signed off on each one.  I
16 agree with defendant because a purported waiver by defendant
17 regarding the accuracy of the records does not vest Pinney with the
18 personal knowledge to attest to their accuracy.  This statement is
19 stricken.

20     In paragraph 10, Pinney states that "[e]ach weekly time report
21 evidences that employees used the conversion chart to round their
22 time downward which caused a failure to pay all regular and/or
23 overtime wages."  Pinney Declr. at ¶ 10.  I agree with defendant
24 that Pinney lacks the personal knowledge to support this assertion
25 and that it is essentially an inappropriate legal conclusion.  This
26 statement is stricken.

27     Finally, in paragraph 15, Pinney states that "[t]he weekly
28 time reports attached as Exhibits 1-79 evidence that US Bank failed

38 - FINDINGS & RECOMMENDATION/ORDER

1  to compensate 79 different employees for time worked because of the

2  rounding policy." Pinney Declr. at ¶ 15. I agree with defendant

3  that this is an inappropriate opinion about a legal issue disputed

4  in the case. This statement is stricken.

CONCLUSION

6     I recommend that plaintiffs' renewed motion for notice (#90)

7  be denied, and that plaintiffs' motion to toll the statute of

8  limitations (#90) be denied as moot. Defendant's motions to strike

9  (#107, #120) are denied as moot except for the part of the motion

10  directed at portions of Pinney's declaration (#107) which is

11  granted.

SCHEDULING ORDER

13     The above Findings and Recommendation will be referred to a

14  United States District Judge for review. Objections, if any, are

15  due August 16, 2005. If no objections are filed, review of the

16  Findings and Recommendation will go under advisement on that date.

17     If objections are filed, a response to the objections is due

18  August 30, 2005, and the review of the Findings and Recommendation

19  will go under advisement on that date.

20     IT IS SO ORDERED.

22                    Dated this __29th__ day of _July_, 2005.

25                                    _____

26                                    Dennis James Hubel
                                     United States Magistrate Judge

39 - FINDINGS & RECOMMENDATION/ORDER