# EXHIBIT 1

1

2          IN THE CIRCUIT COURT OF THE STATE OF OREGON

3                FOR THE COUNTY OF MULTNOMAH

4

5    WILLENE LOWDERMILK,        )
     Individually and on       )
6    Behalf of all persons     )
     Similarly situated,       )
7              Plaintiffs,     )
          Vs.                  )No. 0603-03335
8                              )
     US BANK NATIONAL          )
9    ASSOCIATION, dba US       )
     BANK,                     )
10             Defendants.     )

11

12

13          BE IT REMEMBERED THAT on the 17th day of

14   July, 2007, the above-entitled matter came on for

15   Hearing before THE HONORABLE CHRISTOPHER MARSHALL,

16   Circuit Court Judge.

17

18

19

20

21

                    DEBORAH L. COOK
22                COURT REPORTING
               1102 N. Springbrook Road
23                  Suite 136
               Newberg, Oregon   97132
24               (503) 537-0339
             deb@cookcourtreporting.com

25

1   The Social Security number and the name, I believe, were

2   redacted.  The point being with this is that the

3   declaration of Mr. Christon does not say that the time

4   was not entered into the spreadsheet, that the

5   spreadsheet did not calculate the worktime exactly as

6   plaintiffs were told it did.  It doesn't address any of

7   that.  It simply says he has not seen the form.  Not the

8   same thing.

9              The real point of the declaration of

10  Mr. Ramos is that it's put into their computer system.

11  Now, the computer system does the truncation.  That

12  error, human error, has been taken out of the

13  calculation because of that.  So is this a policy of the

14  bank?  Is it the practice of the bank?  Of course it is,

15  because they created the spreadsheet.

16             MR. McCRACKEN:  Mr. Ramos doesn't say who

17  created it.  There's no proof that it was ever used by

18  anyone but him.  Christon never saw it before.

19             MR. PINNEY:  I believe in his depo he

20  testified that either he created it, or had it created.

21             MR. McCRACKEN:  You are talking about two

22  different documents.

23             MR. SCHUCK:  This is the testimony on the

24  screen of Mr. Christon.  The question is, "The totals

25  that are represented on the total hours worked are where

1    the Excel spreadsheet does the rounding; isn't that

2    correct?"    "I believe so, but I would have to check,

3    but I believe that's correct."

4            Question, "The Excel spreadsheet formulas

5    are a formula, are formulas that are built by US Bank as

6    a part of US Bank's process; isn't that correct?"

7    "That's correct."

8            So we have Ramos, whose information is put

9    into a spreadsheet.  We have Mr. Christon testifying

10   that they created the spreadsheet.  And the documents

11   that were printed off in the computer show that the

12   truncation occurred just as they said in the work

13   column.

14           Now, whether or not the plaintiffs prevail

15   on that, again, isn't the issue because the Court isn't

16   going to the merits.  The Court is determining whether

17   there are common issues of law or fact, whether the

18   plaintiffs' claims are typical.

19           There are common questions.  We have talked

20   repeatedly about the conversion, whether that conversion

21   is appropriate, whether the Federal law applies, the

22   Federal Rule of Regulations, whether, if it applies, how

23   it applies, and the results of that.  Those are all

24   common questions.  This Court will be looked to to

25   answer those rules of law for the entirety of the class

1   all at once.

2                In 1992 Oregon changed.  Oregon allowed for

3   individualized trials, individualized evidence on

4   particular class members.  The key here is whether there

5   are common questions that look to the whole.  If you

6   make a ruling on one, will it help the rulings on the

7   other?  And the answer to that is, absolutely.  How can

8   it not?

9                If this Court finds that the Federal rules

10  do not apply to Oregon wage and hour, that's a ruling in

11  this case that affects everyone.  If this Court rules

12  that the truncation policy and the truncation chart in

13  itself is a violation, that affects everybody.  If it

14  rules the other way, it also affects everyone.

15               Those are common questions that predominate

16  over everything else, because those are the first

17  questions that you have to determine and they affect

18  everybody.  Will there potentially be other issues that

19  get looked at on a smaller scale inside of the case?

20  Yes.  But that is specifically contemplated by the

21  legislature.  And that was the Shay case where it said

22  that in 1992 it changed, and now there is not a flat

23  prohibition against mini trials.  Again, that is on page

24  207.

25               I think with that, Your Honor, I am done,

1    unless you have any specific questions.

2              THE COURT:  I had a question relating to

3    this issue about the -- as I understand what you are

4    saying as far as this Excel program, when did this come

5    into being?

6              MR. SCHUCK:  The deposition of Mr. Christon

7    where he testified that they did, that took place on

8    July 18, 2006.  And I think he testified that it was

9    like 2003 or 2004.  We know that it was going on in

10   2005, because that's when the Ramos documents are from.

11             THE COURT:  So when is Ms. Lowdermilk no

12   longer employed at the bank?

13             MR. SCHUCK:  Ms. Lowdermilk was no longer

14   employed in late 2005, I think.  It looks like

15   December 29, 2005.

16             THE COURT:  So I want to make sure I

17   understand what you are saying, that the truncation

18   policy at some point becomes part of a computer program,

19   so that it's no longer subject to the individual

20   interpretations of any chart on a timesheet.  The

21   individual simply enters their time worked on a time

22   card, and then a program then calculates or does the

23   truncation mechanism.  Is that what you are saying?

24             MR. SCHUCK:  That is what I am saying.

25             THE COURT:  And that Ms. Lowdermilk was

1    employed at the bank during the time period that this

2    was used?  Are you saying that?

3              MR. SCHUCK:  She was employed at that time,

4    yes.  What the documents -- the other part of today was

5    a motion to compel documents.  And part of that was for

6    the electronic information that is recorded in these

7    spreadsheets.  And what plaintiff had sought to do was

8    to provide the Court with those records to show that the

9    truncation actually occurred through that program.  And

10   instead, all we have is the documents we submitted with

11   the Ramos declaration showing that that was occurring.

12             THE COURT:  So what is there to show that

13   that was during the time that your purported class

14   representative was employed at the bank?

15             MR. SCHUCK:  Well, the class period goes

16   from the date of filing back, and the claim is for the

17   actual truncation.  And so you have before you documents

18   showing the truncation occurred for Plaintiff

19   Lowdermilk.  And, in fact, there are multiple pay

20   periods where she actually lost time because of the

21   truncation by admission by defendant.

22             THE COURT:  No, but aren't you saying that

23   at some point in time what used to be a manual function

24   that was left to interpretation by employees, then no

25   longer became that, because then you had this computer

 1   program that took data supplied by each individual

 2   employee, and then did the truncation?  Isn't that what

 3   you are saying, or am I missing something?

 4              MR. SCHUCK:  I am saying that the bank

 5   implemented a spreadsheet, an Excel spreadsheet as

 6   testified to by Christon, and that it resulted -- that

 7   that resulted in unpaid wages as well, yes.

 8              THE COURT:  So is there something that

 9   shows that Ms. Lowdermilk is -- that that spreadsheet

10   was used during the time period that she was employed?

11              MR. McCRACKEN:  I am dying to weigh in --

12              MR. SCHUCK:  The answer to that is that I

13   haven't gotten everything electronically, and I don't

14   think that that is -- I think that the truncation is

15   true for Plaintiff Lowdermilk, but I do not think that

16   the truncation and spreadsheet is true for Lowdermilk.

17              THE COURT:  Isn't that part of what you are

18   trying to have a class action certified for is that you

19   have this systematic occurrence and that it is occurring

20   now via a computer program?  What happened manually is

21   now done by a computer program that results in this

22   truncation.  But you are saying that the person that you

23   are attempting to have certified as the class

24   representative, there's nothing in the record to show

25   that she was employed at the bank during this time that

1    a computer program has been in place, right?

2                    MR. SCHUCK:  Close.  What I am saying is

3    that we're attempting to certify the claim for unpaid

4    wages based on defendant's truncation of time and the

5    result in unpaid wages.  McElmurray -- I'm sorry,

6    Ms. Lowdermilk has that claim.  And what -- as further

7    evidence that the class exists out there, I am putting

8    in evidence that the bank has implemented electronic

9    spreadsheet versions of that, which caused the

10   truncation as well.

11                   THE COURT:  Right.  But so what you are

12   saying, at some point the bank made this implementation,

13   right?  And that there's nothing in the record to show

14   that that implementation occurred while Ms. Lowdermilk

15   was an employee of the bank, right?  And the reason I am

16   asking is, don't you have two different situations.  If

17   what you are alleging is that up until some point in

18   time you had these timesheets where each employee made

19   manual entries, and they -- manual entries as to what

20   time they were there, and then they also made a manual

21   entry calculating how many hours that was, for instance,

22   6.1 hours.

23                   But at some point the computer program goes

24   into place where the employees are no longer doing that

25   truncation calculation, as you are alleging it to be,

1    and that the employees are supplying the time frame

2    which they worked, and then the computer program does

3    the calculation, right?  Isn't that what you are saying?

4              MR. SCHUCK:  That's is what I am saying.

5              THE COURT:  So aren't those two different

6    claims when you are talking about potentially a class

7    action situation, because aren't there different issues

8    involved in a manual system, versus a computer-driven

9    system?

10             MR. SCHUCK:  There is an additional issue

11   that is in there, that's correct.  But the claim is for

12   the unpaid wages that results from the truncation

13   practice and policy.  That claim goes over both of those

14   issues.  It covers whether it's done by the computer,

15   and whether it's done by the employee.  The practice at

16   the bank is a little bit easier, and a little bit more

17   clear where they have done it via computer because

18   there's no mathematical errors.  Anytime a human does

19   regular math, there is invariably errors.

20             So it does change it a little bit, but the

21   claim is still for the unpaid wages, and it's for the

22   identical practice.

23             THE COURT:  Well, am I missing something

24   here?  Or doesn't it change it more than a little bit?

25   I mean, if any truncation is being done by the computer,

1    and it's always done the same so that it's always

2    rounded down, isn't that an entirely different situation

3    than where the calculation is done manually by each

4    individual employee, some of whom might be rounding up,

5    some might be rounding down, some might be doing all

6    different kinds of math that would require an individual

7    inquiry as to what each employee is doing, as opposed to

8    a situation where you are saying, well, the bank has

9    this policy, and then they have got this computer

10   program whereby the employee furnishes what time they

11   worked, and then the computer program takes that

12   information and always truncates the time?  Aren't those

13   two totally different scenarios?

14            MR. SCHUCK:  I don't believe that they are

15   totally different, and the reason I don't is because the

16   claim underneath it is the same.  It's for the unpaid

17   wages that result from the policy and practice.  I agree

18   with you --

19            THE COURT:  Wait a minute.  The policy and

20   practice, the practice that you are talking about are

21   two entirely different things under those scenarios,

22   aren't they?

23            MR. SCHUCK:  I agree with you at least in

24   this part, that the electronic version is far simpler,

25   because there is not going to be mathematical errors.  I

1    agree with you that that cleans up exactly what the bank

2    intended to do, did.  It cleans it all up, because it's

3    all right there.

4                But the claim is still the same.  The claim

5    is that the policy and practice is set out on the sheet.

6    It has the rounding chart, the conversion chart, and the

7    practice truncates time away from the employee.

8                THE COURT:  But you are talking about two

9    completely different things when you are saying

10   practice, because -- aren't you?  Because if the

11   practice is each employee puts down the time that they

12   worked, and then a computer program truncates that time

13   so it's always rounding down, never up, always down,

14   that's a totally different practice than, well, each

15   employee has a time card.  They write down what time

16   they worked, and then they also do a calculation

17   themselves, and are instructed to round down.  That's a

18   totally different practice, isn't it?

19               And so when -- how can you have a class

20   action lawsuit that deals with those two different

21   practices, because aren't they totally different?  And

22   the one that does not involve the computer program,

23   wouldn't it require an individual inquiry as to each

24   potential plaintiff as to exactly what they were

25   instructed and exactly what they did, whereas when you

1   are talking about the computer program claim, then it

2   doesn't require that individual inquiry; isn't that

3   right?

4                MR. SCHUCK:  Yes.  It is correct in the

5   sense that it is -- the practice is slightly different

6   in that -- I guess I won't use the term slightly --

7                THE COURT:  Why do you say slightly?  It's

8   two totally different practices, isn't it?

9                MR. SCHUCK:  It's all based on the same

10  policy.  The policy is set out and the practice is of a

11  truncation.

12                There is a second -- the practice is

13  identical.  And then there's a second practice to

14  make -- to ensure that it is actually followed.  But the

15  practice is the same, because the practice is for the

16  employee to truncate the time.

17                And Your Honor is completely correct.  It

18  is a lot more accurate.  It takes out some of the

19  guesswork in it, because you are looking at it trying to

20  figure out the math that somebody else did where there

21  might be an error, versus a computer that doesn't make

22  an error.  Once the time is entered, the end result is

23  known.

24                THE COURT:  It doesn't just involve

25  potential errors when people are doing this manually.

1    It involves what they are doing, doesn't it, because you

2    might have somebody that even though you have this

3    timesheet there that has this little chart over to the

4    right-hand side that says 0 to 5 minutes equals zero, 6

5    to 12 equals .1 or 6 to 11, right, equals .1, you might

6    have an employee who never even looked at that, and

7    never even noticed that that was even over there.  And

8    did their own method of deciding whether they had 6.1 or

9    6.2 hours.

10              Isn't that a totally different situation

11    than if all that employee does is write down, I was

12    there from 8:03 to 5:02, and they furnish that

13    information, and then the computer decides whether they

14    have 8.3 or 8.4 hours?  Isn't that a totally different

15    set of claims?

16              MR. SCHUCK:  It is not a totally different

17    claim, because the claim is for the unpaid wages that

18    result from the truncation.

19              THE COURT:  But you are saying --

20              MR. SCHUCK:  -- involved in there --

21              THE COURT:  But you are saying this should

22    be a class action lawsuit, and that your plaintiff is a

23    representative of all of the plaintiffs who would have a

24    certain type of claims, and it sounds to me like you

25    might have plaintiffs that at different points in time

1    might have two different types of claims of what the

2    practice was at the bank.  Because if at some point they

3    implemented this computer program that did this

4    truncating automatically, isn't that a different group

5    of claimants than for those who came before that where

6    it was all done manually?

7                    MR. SCHUCK:  I don't believe it is, because

8    it is still the unpaid wages that result in the

9    truncation chart.  It's a policy and practice that we're

10   dealing with in the whole.  The difference is that when

11   they implement it into the computer, there can be no

12   mathematical errors anymore.

13                   THE COURT:  So what if Ms. Lowdermilk

14   wasn't working there anymore once this computer program

15   is --

16                   MR. SCHUCK:  But her claim is from date of

17   filing back, and that is the class that she seeks to

18   represent.  And it's an appropriate class, because the

19   policy and the practice of the bank was that they had

20   the conversion chart, and it resulted in unpaid wages

21   because it truncated time.  The truncation is the same.

22   The chart is the same.  The difference is that one is

23   cleaner without mathematical errors.

24                   THE COURT:  So you are dying to say

25   something, so go ahead.

1          MR. McCRACKEN:  Your Honor was drawing a

2    distinction between the manual and the Excel timesheets.

3    I just want to make sure Your Honor understands that

4    Ms. Lowdermilk did use a timesheet that was an Excel

5    timesheet.  However, the conversion in that timesheet

6    was not a truncation time -- not a truncation

7    conversion.  It rounded up and down.  It's not the

8    conversion chart they complain of that always rounded

9    down.  The formula in the Excel spreadsheet --

10          MR. SCHUCK:  And that is not in the record,

11   Your Honor.  The timesheets are, but there's no

12   testimony in the record saying that Ms. Lowdermilk's was

13   done by an Excel spreadsheet.

14          MR. McCRACKEN:  May I point you to what is

15   in the record about how this conversion chart -- or how

16   the Excel spreadsheet Ms. Lowdermilk used worked?  And I

17   point you to Exhibits 116 through 156, which are --

18   which is the only evidence in the record of anyone using

19   this timesheet.

20          THE COURT:  What timesheet?  The Excel?

21          MR. McCRACKEN:   The Excel spreadsheet with

22   the conversion in it.  On week ending February 16, 2005,

23   none of her time was rounded up or down.  On

24   Exhibit 117, the following week, she came out ahead by

25   one minute.  Overall, she came out ahead during the time

1  period she used this Excel spreadsheet timesheet by

2  one -- in excess of 120 minutes.  And you can flip

3  through those exhibits to see our analysis of whether

4  she came out ahead or behind.  And it's summarized in my

5  declaration at Appendix A, that during the time she used

6  this Excel spreadsheet, she came out 120 minutes plus

7  ahead.

8            That's the Excel spreadsheet that

9  Mr. Christon was testifying about and what they have up

10 on the screen, he was talking about that timesheet.  He

11 was not talking about the Dennis Ramos' timesheet.

12            Dennis Ramos' timesheet was marked as

13 Exhibit 4 to Mr. Christon's declaration.  The testimony

14 you see here up on the screen is on page 108.

15 Mr. Ramos' timesheet was not marked until page 109.

16 Mr. Pinney handed Exhibit 4 to Mr. Christon and asked,

17 "Do you recognize this Weekly Time Report?"  "No, I

18 don't," was the answer.

19            Mr. Christon did not recognize Mr. Ramos'

20 Weekly Time Report.  In his declaration in the record he

21 has stated, Mr. Christon has stated that Mr. Ramos' form

22 of Weekly Time Report was not the bank's official form.

23 He had never seen it before.  He's the payroll manager.

24 He's responsible for what is the official form.

25            THE COURT:  So let me ask you this,

1    Mr. Schuck.  Where in the record is there some evidence

2    to show that Ms. Lowdermilk, for her time, there was an

3    Excel spreadsheet that was used that truncated time?

4              MR. SCHUCK:  There is no indication in the

5    record that Ms. Lowdermilk ever used an Excel

6    spreadsheet with regard to her time, period.

7              THE COURT:  Well, then how can she be a

8    class representative for a claim that involves --

9    partially what the claim involves is the use of an Excel

10   spreadsheet that automatically truncates employees'

11   time?

12             MR. SCHUCK:  She is a representative

13   because she has the claim for truncation of time.  The

14   claim is one for unpaid wages based on the truncation

15   met.  The methodology of truncating wages, that is the

16   claim.  Whether it is done by one tool, human, or

17   another tool, computer, isn't the issue.  The issue is

18   whether the truncation occurs and the resulting wages

19   are due and owing, and whether that is a claim.

20             THE COURT:  But when you are examining

21   whether you should certify a class or not, isn't that a

22   pertinent inquiry?

23             I mean, if part of what you are claiming is

24   there is this systematic truncating that is done via,

25   you said, these Excel timesheets, isn't that something

1      totally different than claiming that employees are given

2      these timesheets that have this chart over on the

3      right-hand side that seems to tell them to truncate in

4      their own calculations, but then the employees are left

5      to do the calculations themselves?  Isn't that a

6      completely different claim than having a computer

7      program that automatically truncates the time?

8                MR. SCHUCK:  It is not a different claim.

9      It is a different method to the same claim.

10               THE COURT:  But when you are analyzing,

11     certifying a class action, isn't that one of the things

12     that you are looking at?  In other words, if you have

13     Ms. Lowdermilk, and she happens to be employed at the

14     bank, and she is using either a timesheet where she does

15     manual calculations, and then at some point the bank

16     starts using Excel timesheets that you are saying

17     automatically truncate, but she never used one of those

18     timesheets, but part of the class that you are trying to

19     certify is people that did use those timesheets, how can

20     she represent those people when she never used one?

21               MR. SCHUCK:  Because it's the policy and

22     practice that is built into the spreadsheet that is the

23     claim.

24               THE COURT:  You keep saying "the practice,"

25     but those are two completely different practices.

1          MR. SCHUCK:  The practice of the truncation

2   isn't.  It's identical.  The only difference is the tool

3   that implements it.  So there is a difference.

4          I understand what you are struggling with,

5   and I am trying to be clear with what I am saying.  It

6   is the truncation itself, that's the claim.  It is the

7   unpaid wages that result from the truncation.  Whether

8   that is done by a computer or a hand, that's not the

9   point.  The point is --

10          THE COURT:  Might it be the point, though,

11   when you are talking about a class action?

12          MR. SCHUCK:  It certainly makes the --

13   makes the summary judgment and other issues a lot easier

14   when it's done by the computer.

15          THE COURT:  Doesn't that eliminate all of

16   this issue about, well, you would have this class action

17   where you have to depose each of the plaintiffs to see

18   what they were actually doing, and whether they even

19   paid attention to this little chart over on the

20   right-hand side, or whether they were instructed a

21   different way, and they actually always rounded up

22   instead of rounding down.

23          That's a whole different thing than saying,

24   there's this computer program that does all of that, so

25   that's the way the bank's policy gets implemented,

1    through a computer program.  And that doesn't allow for

2    any individual variance.

3              So that seems to be a whole different

4    situation than a claim that, well, you had this

5    timesheet, and it had this chart over on the right-hand

6    side.  And the individual employee may or may not have

7    ever noticed that chart over on the right-hand side, and

8    if they noticed it, they may have been instructed to

9    ignore it.  They may have been instructed to always use

10   it.  You could have all different groups of employees

11   within US Bank that were instructed in all different

12   ways, and used that chart, or didn't use it.

13             As opposed to if you had a period of time

14   where now it's all done by computer program, isn't that

15   a whole different claim?

16             MR. SCHUCK:  Well, we're kind of -- I don't

17   think it's a different claim.  And I have already given

18   you my rationale on that.  And I know sometimes it's

19   frustrating when people repeat themselves, so I don't

20   know how else to put it to you.

21             THE COURT:  Let me put it this way.  If you

22   had this person who happens to be Ms. Lowdermilk who is

23   named as the plaintiff, so if she never used an Excel

24   timesheet that did any rounding down, how can she be the

25   class representative for those employees that did use

1  such a timesheet, if there are such people?

2            How can she represent their claims, because

3  claims that are based on manual entries might be suspect

4  to all -- susceptible to all different defenses than

5  those that are under the computer system.  Isn't that

6  possible?

7            MR. SCHUCK:  First of all, the question

8  assumes, just to point out, that there's a class of

9  those people who used the handwritten timesheets.

10           Now, if what the Court is saying is that

11  there's a separate class for those who used the

12  electronic version, I would say that that is a subclass.

13  There might be more claims against -- more defenses

14  against the handwritten because of miscalculations or

15  whatever, that won't exist with regard to the

16  electronic.  I agree with that.

17           THE COURT:  Let's go back to the whole

18  underlying -- the law relating to your underlying claim.

19  And I am going to get it wrong, because you folks

20  practice in this area all the time, so you probably have

21  the language memorized.  Systematic -- what you have to

22  show that the bank had a policy of -- systematic what?

23           MR. SCHUCK:  That's one of the -- common.

24           THE COURT:  When it talks about underpaying

25  people because of this truncation, they have to show --

1    you were talking about the statutes there.

2              MR. SCHUCK:  The CFR that I think Your

3    Honor is referring to is a Federal regulation that says

4    that over a period of time the rounding -- for it to be

5    an appropriate rounding policy, must average out over

6    time.

7              Plaintiffs' position is that that is a

8    legal question common to class, and it does not apply.

9    But it sounds like that is what you are referring to.

10             What claimants claim we have to show is

11   wages remain due, and that they weren't paid on payday.

12   We believe that's what Oregon law says.  And how the two

13   groups that we're talking about, the electronics group

14   and the hand timesheet group, have is that the

15   truncation was set out in both.  That the same policy

16   existed in both, and the same practice existed in both.

17             And the fact that the bank updated and went

18   to an electronic system only clarifies that.  It doesn't

19   change that.

20             THE COURT:  Okay.  I follow what you are

21   saying.  I don't have any further questions.  Did you

22   have any further comments?

23             MR. McCRACKEN:    No.

24             THE COURT:  All right.  The Court will take

25   the motion under advisement here, and get a decision out

Page 103

1    to you as soon as we can.  But thank you for your very

2    thorough presentation of the issues here.

3                    MS. BERNICK:  Thank you, Your Honor.

4                    MR. SCHUCK:  Thank you.

5                    END OF PROCEEDINGS:  12:15 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

1  STATE OF OREGON  )

2                   )Ss.

3  COUNTY OF YAMHILL)

4

5         I, Deborah L. Cook, RPR, Certified Shorthand

6  Reporter in and for the State of Oregon, hereby

7  certify that at said time and place I reported in

8  stenotype all testimony adduced and other oral

9  proceedings had in the foregoing hearing; that

10 thereafter my notes were transcribed by computer-aided

11 transcription by me personally; and that the foregoing

12 transcript contains a full, true and correct record of

13 such testimony adduced and other oral proceedings had,

14 and of the whole thereof.

15         Witness my hand and seal at Dundee, Oregon,

16 this 23rd day of August, 2007.

17

18

19

20         DEBORAH L. COOK, RPR

           Certified Shorthand Reporter

21         OREGON CSR #04-0389

           CALIFORNIA CSR #12886

22         WASHINGTON CSR #2992

23

24

25